848 F.2d 192
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Patricia MCINALLY, Plaintiff-Appellant,
v.
Otis R. BOWEN, M.D., Secretary of Health & Human Services,
Defendant-Appellee.
 No. 87-1472.
 United States Court of Appeals, Sixth Circuit.
 May 31, 1988.
 
 Before LIVELY, KRUPANSKY and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Patricia McInally appeals from the district court's order affirming the Secretary's decision to deny a period of disability and disability insurance benefits. After considering the parties' briefs and the record below, we conclude that the Secretary's decision is supported by substantial evidence. Accordingly, we affirm the order of the district court.
 
 
 2
 * McInally was born on April 4, 1935. After completing high school, she worked as a licensed practical nurse. Her previous employment included work for the Lapeer County Medical Care Facility (nursing home); the Lapeer County General Hospital; and as a private duty nurse.
 
 
 3
 On July 31, 1985, McInally applied for disability insurance benefits, alleging she became disabled on June 14, 1985. She alleged disability due to degenerative disc disease and heart disease. Her claim was denied initially and upon reconsideration.
 
 
 4
 After a hearing, an Administrative Law Judge (ALJ) ruled that McInally was not entitled to benefits. The ALJ determined that McInally "has the severe impairments of lumbar and cervical degenerative arthritis and angina pectoris," but held that she did not have an impairment or combination of impairments which met or equaled those in the listing of impairments in Appendix 1 to Subpart P of Part 404. 20 C.F.R. Sec. 404.1520(d). After noting that McInally's subjective complaints were overstated in view of the objective evidence of record, the ALJ further found that McInally retained the residual functional capacity for a "limited range of light and sedentary semi-skilled work," such as ward clerk, health aid, diet clerk, record clerk, and information clerk.[1] In reaching this conclusion, the ALJ relied on the vocational expert's testimony in response to a series of hypothetical questions incorporating the medical findings of record; and Rules 201.15 and 202.15, and section 201.00(h) of the medical-vocational guidelines "as a framework." 20 C.F.R. Sec. 404, Subpart P, Appendix 2. See 20 C.F.R. Sec. 404.1569. The ALJ's decision was upheld by the Appeals Council, a magistrate and the district court.
 
 
 5
 Our review of the Secretary's decision is limited to determining whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). A reviewing court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.1984). "Even if the court might arrive at a different conclusion, the decision must be affirmed if supported by substantial evidence." Siterlet v. Secretary of Health and Human Services, 823 F.2d 918, 920 (6th Cir.1987) (citation omitted).
 
 II
 
 6
 McInally argues that the ALJ erroneously concluded that she retained the residual functional capacity to perform a limited range of light and sedentary work. We disagree.
 
 
 7
 There is substantial evidence to support the ALJ's conclusions. Without reiterating all the medical evidence of record, we note the following pertinent findings. With respect to heart disease, McInally stated that she only takes nitroglycerin every three or four months and has not suffered a severe angina attack since 1984. In 1984, Dr. Jeffrey Harris examined the claimant and performed various studies in response to her complaint of crushing pain. The radiology report indicated that her heart and lungs were normal. Following coronary angiography, Dr. Harris reported that the coronary arteries were normal, with "no significant coronary disease." An echocardiogram showed that although there was a possibility of small anterior pericardial effusion, the left ventricular function was within normal limits and the valvular structures were normal. He concluded that the "echocardiogram is felt to be grossly within normal limits." In a second report during this period, Dr. Harris noted chest pain but ruled out unstable angina pectoris. He did not place any "significant physical restrictions" on the claimant. In September 1985, Dr. John Wiley examined McInally and found no "significant Q waves or ST T wave changes." Review of all tracings before, during and after a treadmill test revealed "no ischemic changes."
 
 
 8
 Although there is conflicting medical evidence concerning the severity of McInally's disc disease, we are satisfied after carefully reviewing the entire record that the ALJ's conclusions are supported by substantial evidence. By her own admission, McInally does not use an assistive device to walk, she can squat and bend about halfway to the ground, she can lift and carry ten pounds approximately twenty feet, and she has never had home traction. Indeed, no physician has recommended or performed surgery for her back, and she does not take medication for the problem.
 
 
 9
 In September 1985, Dr. Wiley found that claimant's range of motion of the joints was grossly normal. All joints were free of tenderness, erythema and effusion. McInally had no difficulty getting on or off the examination table, and there was only "mild" difficulty heel-and-toe walking and squatting. Motor and sensory functions remained intact. Dr. Wiley could not find any evidence of nerve root irritation. Dr. Winston's radiology report of the same month, which focused on the lumbar spine, indicated that there was mild to moderate narrowing of the disc spaces between L1 and S1, but only mild degenerative changes affecting the hip joints. Slight end plate spurring was also noted.
 
 
 10
 Dr. Elizabeth Edmond found that lumbosacral forward flexion was possible to 70?, lateral flexion bilaterally to 20?, and extension to 10? with pain produced at the sacroiliac joints bilaterally. Straight leg raising at 60? bilaterally produced only "mild" bilateral sacroiliac discomfort. Significantly, she found "[n]o definite lumbar paravertebral muscle spasm." Individual muscle testing was normal in the lower extremities. After examining the radiological reports, Dr. Edmond concluded that McInally was suffering lumbar and cervical degenerative arthritis.
 
 
 11
 Dr. Helen Winkler examined McInally in February 1986 and came to essentially the same conclusions as Dr. Edmond. She found only slight tenderness in the cervical paraspinal muscles and cervical spine. The right sacroiliac joint was tender. Forward flexion of the lumbar spine was limited and accompanied by pain. Straight leg raising was accompanied by right sacroiliac pain bilaterally. The reflexes were active. She concluded the claimant suffered from angina pectoris, possible coronary artery disease, and low back pain syndrone. She agreed with Dr. Edmond's assessment that McInally could not perform her past relevant work as a licensed practical nurse.
 
 
 12
 Based on the foregoing, the ALJ was entitled to conclude that McInally could perform a limited range of light and sedentary work. We find significant the absence of muscle spasm, the lack of medication for the problem, and no recommendation for surgery. In addition, McInally retained fairly good range of motion, could heel-and-toe walk, and, by her own admission, could squat, bend halfway to the ground, and carry ten pounds some twenty feet. None of the physicians indicated that her back problem was severe or disabling.
 
 
 13
 McInally argues that the ALJ improperly discounted the medical conclusions of her chiropractor, Dr. Rossow. The record contains two letters from Dr. Rossow. The first, dated March 19, 1986, states that McInally was being treated for suspected disc protrusion at L5-S1. He concluded that McInally was suffering from "severe chronic lumbar muscle spasm" and should be "restricted from all physical activities."
 
 
 14
 According to Dr. Rossow's February 19, 1986, letter, an examination of the lumbar spine revealed "objective muscle spasm," as well as palpation tenderness of the paravertebral musculature throughout the lumbar spine. The range of motion studies revealed a "marked reduction to the normal range of flexion, extension, right and left rotation, and right and left lateral bending."
 
 
 15
 X-rays revealed a decrease in the normal cervical and lumbar curves, degenerative changes of the anterior bodies, and hypertrophic spurring with diminution of the disc spaces in both the cervical and lumbar spines. The claimant was treated for a neurospinal compression syndrome of the lumbar spine with suspected disc protrusion at L5-S1. Dr. Rossow concluded that McInally had "incurred extensive damage to the supportive structures of her lumbar spine, particularly to the tendons, ligaments and musculature."
 
 
 16
 The ALJ had this to say about Dr. Rossow's reports: "the undersigned was not overly impressed by the paucity of physical examination factors set out by Dr. Rossow in the report, and certainly feels that based upon the entire medical evidence of record, the grossly restrictive limitations set out by Dr. Rossow in [his reports] are not substantiated by the physical examination results of Drs. Winkler, Edmond or Wiley."
 
 
 17
 The ALJ did not err in discounting Dr. Rossow's reports. A chiropractor is not an acceptable medical source, 20 C.F.R. Sec. 404.1513, although the claimant may offer such evidence to help the Secretary understand how claimant's impairment affects the ability to work. Id. at Sec. 404.1513(e)(3). Even if Rossow were an acceptable medical source, his opinion could be afforded little weight because he failed to submit any medical data, such as X-rays, to substantiate his conclusions. King v. Heckler, 742 F.2d 968 (6th Cir.1984).
 
 III
 
 18
 McInally argues that the ALJ improperly discounted her claim of severe pain, which she says is disabling. Her contention must be analyzed according to the standard set forth in Duncan v. Secretary of Health and Human Services, 801 F.2d 847 (6th Cir.1986).
 
 
 19
 First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.
 
 
 20
 Duncan, 801 F.2d at 853. See also S.Rep. No. 466, 98th Cong., 2d Sess. 24, reprinted in 130 Cong.Rec. S6221 (daily ed. May 22, 1984).
 
 
 21
 Although there is objective medical evidence of an underlying medical condition, the objective medical evidence does not confirm the severity of the alleged pain arising from the condition, and the objectively established medical condition is not of such severity that it can reasonably be expected to produce the alleged disabling pain. Significantly, none of the physicians diagnosed claimant's back pain as severe or disabling. Although the medical evidence indicates that McInally suffers from degenerative disc disease, none of the reports, except Rossow's, indicate that the condition is severe. See Duncan, 801 F.2d at 853-54. As noted, the ALJ could properly discount Dr. Rossow's findings.
 
 IV
 
 22
 McInally's remaining contentions require little discussion. She argues the ALJ applied a sit and squirm test, which is discredited in this circuit. To be sure, the ALJ considered the claimant's behavior during the administrative hearing, in relation to her various complaints (including her inability to sit without pain longer than fifteen minutes), as a factor in his credibility determination. However, a fair reading of the ALJ's opinion indicates that he examined the entire record in reaching his conclusions.
 
 
 23
 Finally, McInally argues that, since she is disabled from performing her past relevant part-time work, she does not have the residual functional capacity to perform a limited range of light and sedentary work. She says the fact that she previously worked part-time should have been included in the hypothetical questions posed to the vocational expert. However, this argument ignores the fact that her former work was significantly more demanding than the alternative jobs identified by the vocational expert. That McInally's medium to heavy work as a licensed practical nurse was performed on a part-time basis has little bearing on her ability to perform less demanding alternative jobs that are available in the national economy. Consequently, the ALJ did not err in formulating his questions for the vocational expert.
 
 
 24
 In determining that McInally was not disabled, the ALJ used the medical-vocational guidelines "as a framework" and properly relied on the vocational expert's testimony, which was elicited in response to a series of hypothetical questions that accurately reflected the medical evidence of record. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir.1987). After carefully reviewing all the medical evidence, we agree with the district court that the ALJ's conclusions are supported by substantial evidence.
 
 
 25
 Accordingly, the district court's order affirming the Secretary's denial of benefits is AFFIRMED.
 
 
 
 [1]
 The ALJ concluded that McInally was unable to perform her past relevant work as a licensed practical nurse